# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MAURICE INGRAM, | 1:06cv01643 DLB HC |
| Petitioner, | ORDER REGARDING PETITION FOR WRIT OF HABEAS CORPUS (Document 1) |
| v. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
| PAT L. VASQUEZ, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge

## **PROCEDURAL HISTORY**[1]

On May 15, 2003, in the Kern County Superior Court, a jury convicted Petitioner of second degree murder, gross vehicular manslaughter while intoxicated with two prior convictions for driving under the influence, driving under the influence with prior convictions, driving with a blood alcohol of more than 0.08 percent with prior convictions, and misdemeanor driving with a

---

[1] This information is derived from the petition for writ of habeas corpus and Respondent's answer to the petition.

1  suspended license with a prior conviction for driving with a suspended license.  He was

2  sentenced to 15 years to life in state prison.

3        The Fifth District Court of Appeal affirmed Petitioner's conviction and sentence.

4        On September 24, 2004, Petitioner filed a petition for review with the California Supreme

5  Court.  The court denied the petition on October 27, 2004.

6        Petitioner filed a petition for writ of habeas corpus with the Kern County Superior Court

7  on February 8, 2005.  The petition was denied on April 4, 2005.

8        Petitioner also filed a petition for writ of habeas corpus with the Fifth District Court of

9  Appeal.  The court denied the petition on November 17, 2005.

10       On January 12, 2006, Petitioner filed his final petition for writ of habeas corpus with the

11  California Supreme Court.  The court denied the petition on September 27, 2006.

12       Petitioner filed the instant federal petition on November 14, 2006.  He argues that (1) he

13  was denied due process, equal protection and a fair trial by the use of tainted and unreliable

14  evidence; (2) he received ineffective assistance of counsel; and (3) the evidence used against him

15  was obtained by an illegal search and seizure.

16       Respondent filed an answer on January 12, 2007.

17       Petitioner filed his traverse on March 1, 2007.

18                            **STATEMENT OF FACTS**[2]

19       On June 21, 2002, Adam Pierce, Alex Lopez and Wayne Yoakum were drinking at a bar

20  in Taft.  Petitioner joined the trio but at some point the men were asked to leave.  The men left in

21  Petitioner's truck with Petitioner driving.  As they were leaving the bar, Petitioner hit a large

22  trash can in the alley.  Petitioner dropped Lopez off at his residence, and then drove to his own

23  apartment.  Petitioner's cousin, Cory Shugart, lived next door and joined the men at Petitioner's

24  apartment.  Shortly thereafter, other people, including Lopez, arrived and the group continued

25  drinking and partying.

26

27  _____

28       [2] This statement of facts is taken from the Fifth District Court of Appeal's August 18, 2004, opinion.

Yoakum saw Petitioner drink two beers at the apartment.  During the course of the evening Yoakum went out twice to buy more alcohol.  On one of his trips to retrieve more alcohol, Yoakum bought whiskey.  According to Yoakum, Petitioner poured whiskey into a 32-ounce cup and added a little ice and soda, and said that would "top him off for the night."  According to Yoakum's fiancée, Kasey Mitchell, she saw Petitioner earlier that night with a "$5 Special" -- a 32-ounce cup, a liter of Pepsi, and a half pint of whiskey.

At approximately 9 or 9:30 that night, the group decided to drive out to an open  field known as the Bone Yard.  Yoakum left with Shugart and Petitioner drove Lopez and Pierce to the field in his truck.  A number of other people, including Robert Bethel and Richard Taylor, had congregated at the Bone Yard to "party."  Sometime after arriving, an argument broke out and the group decided to leave and head back into town.  Pierce and Lopez left with Petitioner in Petitioner's truck.  Petitioner was driving, Pierce sat in the middle and Lopez sat on the passenger side.

Bethel was driving back in his Jeep with Taylor as his passenger when he noticed Petitioner behind him.  Bethel was on a fairly steep downhill portion of the road when Petitioner crossed the double yellow lines and passed him in the left lane.  Bethel stated he was traveling approximately 30 to 40 miles per hour and Petitioner was driving 50 to60 miles per hour.  Petitioner passed shortly before a curve in the road, and Bethel noticed Petitioner was traveling "way too fast" to make the turn.  Bethel and Taylor stated the passengers in Petitioner's truck sounded like they were having a good time, and cheering Petitioner for making the pass.  Petitioner was unable to make the turn and drove off the road into a field.  He was able to return the truck back to the road, but overcorrected and hit an embankment on the right side of the road, causing the pickup to flip over and come to rest on the driver's side.

Bethel stopped, as did a number of other people.  Lopez was able to crawl out of the truck through a window.  Petitioner was trapped partially in and partially out of the truck on the driver's side.  Bethel along with a number of others lifted the truck to free Petitioner.  When they lifted the truck, they noticed Pierce trapped underneath the truck.  The group then righted the truck to free Pierce.  Lopez stated he had to leave before the police arrived, and someone at the

1   scene gave him a ride home.  Some people at the scene kicked beer cans into the bushes to hide

2   evidence of alcohol at the scene.  Pierce was badly injured and Yoakum performed CPR until

3   emergency personnel arrived.  Emergency medical technicians arrived at the accident scene at

4   approximately10:00 p.m.  John Todd, an emergency medical technician and a friend of

5   Petitioner's, found Petitioner and Pierce injured at the scene.  Pierce was transported to the

6   helicopter and Petitioner was transported by ambulance.  Todd noticed Petitioner smelled of

7   alcohol, was unresponsive and combative.  Petitioner told Todd "fuck you cops."

8          After the accident, Mitchell took Yoakum home.  He arrived at his residence about the

9   same time as Lopez and they went to the hospital to check on Pierce.  According toYoakum, on

10  the way to the hospital Lopez stated "I told that mother fucker to slow down."  According to

11  Mitchell, Lopez said he told Petitioner to slow down, "you're going to kill someone" or "you're

12  going to kill us all."

13         At the hospital, approximately two hours after the accident, Petitioner's blood was drawn

14  and tested for alcohol.  The hospital performed a serum analysis and concluded Petitioner had a

15  blood alcohol level of .15 percent.  A forensic technician also tested Petitioner's blood, using

16  whole blood analysis, and concluded Petitioner's blood alcohol level was .12 percent.

17  Criminalist Dan DeFraga explained the difference in the levels was due to differing types of tests,

18  and that the two results were consistent.  DeFraga also noted that a person burns off alcohol at a

19  rate of .02 percent per hour.

20         Pierce died from his injuries the following morning.  The cause of death was severe

21  closed head trauma and crush injuries from the accident.  Pierce had a blood alcohol level of

22  .066.

23         Approximately two to three months after the accident, Todd spoke with Petitioner.

24  Petitioner initially told Todd that Pierce was driving the truck, but later admitted that he was

25  driving when the accident occurred.  Petitioner said that he had lost control of the truck because

26  he had no power steering.  On another occasion Todd spoke with Petitioner and asked him if he

27  was aware that a blood test had been performed.  Petitioner was unaware of this fact and voiced

28

concern about it because it might not help his case if he went to trial, due to the "condition" he

was in on the night of the accident.

California Highway Patrol Officer Eric Walker responded to the accident and conducted

an investigation into its cause.  He based his opinion on witness accounts, as well as the physical

evidence at the scene.  Walker observed some skid marks on the road, but opined they were not

related to the accident.  He did find friction marks on the road from where Petitioner's tires hit

the road as the truck flipped over.  Although he could not be sure, Walker opined that the truck

flipped over one and three-quarter times.  Walker explained that Bethel's account of the truck

passing on the left and hitting the embankment was consistent with the physical evidence at the

scene.  However, Walker found no physical evidence that the truck had driven off the road.  He

opined that the accident was caused by excessive speed, crossing over double yellow lines, and

Petitioner's level of intoxication.  Bethel had informed Walker that Petitioner was driving

approximately 60 miles per hour, and Walker explained that it would be almost impossible to

make the turn at that speed.  Approaching the turn at that speed demonstrated a "serious lack of

judgment."

The speed limit on the road where the accident occurred was 55 miles per hour but,

according to the basic speed law, the limit would be lower on some turns where it would not be

safe to drive at that speed.  Walker noted that there were no street lights on the road where the

accident occurred.  The jury was presented with numerous photographs, a diagram and a video of

the road where the accident took place.  California Highway Patrol Officer Donnie Nichols

inspected Petitioner's truck after the accident.  Nichols found an abnormal amount of oil buildup

on the right rear brake from a leak in the rear axle.  Such a buildup could cause the right rear

wheel to lock up if the brakes were applied hard causing the truck to pull to the right; however, it

would not have had much effect on the steering or control of the vehicle.  If the wheel had

locked it would have left a skid mark at the scene.  Nichols found nothing else that could  have

contributed to the accident.

California Highway Patrol Officer Connie Sellers investigated Pierce's death.  She

interviewed Lopez, who initially told her he was not present at the accident.  Subsequently,

Lopez admitted he was there and noted that everyone, including Petitioner, had been drinking fifths of whiskey.  He stated Petitioner was "driving like an idiot" and that he was going too fast to make the turn.  Earlier in the evening Petitioner had been driving off the road through bushes. Sellers also spoke with Taylor who indicated that Petitioner was driving like "crap" on the night of the accident.  In addition, Taylor told Sellers that Petitioner had almost rolled his truck earlier in the evening, when he drove onto an embankment.

Sellers also interviewed Petitioner about the accident.  Petitioner initially stated the truck belonged to his father and he never drove it, but Petitioner's father had already informed the officer that Petitioner drove the truck daily.  Petitioner told the officer that there was nothing wrong with his truck.

Regarding the accident, Petitioner initially stated he did not remember anything about that evening.  Subsequently, Petitioner admitted to drinking one beer, but no whiskey because he does not like whiskey.  Petitioner noticed people drinking at the Bone Yard, but he did not drink there. He remembered driving from the area with Lopez and Pierce as his passengers, and then waking up in the hospital.  Subsequently, Petitioner told the officer that all he remembered about the accident was that he was sitting in the middle and told Pierce to "gun it" because the car in front of them was traveling very slowly.

Petitioner told Sellers that he had previously taken an alcohol awareness course in order to regain his driver's license.  Although he did not complete the course, he recounted five reasons not to drink and drive:  (1) he could be hurt; (2) he could hurt someone else; (3) he could kill someone; (4) he could get in trouble; and (5) it could be very expensive if he were apprehended. He stated that he did not learn anything from the class that he did not already know.

The parties stipulated that Petitioner had suffered two prior convictions for driving while intoxicated, one in December 1995 and the other in March 2000.  Petitioner was ordered to attend an alcohol awareness program.  Jim McManus, the director of Traffic and Alcohol Awareness School of Kern (TAASK), testified Petitioner attended the course from February to November 1999.  The course teaches of the dangers of driving while intoxicated.

1    A.    Jurisdiction

2           Relief by way of a petition for writ of habeas corpus extends to a person in custody

3    pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

4    or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

5    529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

6    violations of his rights as guaranteed by the U.S. Constitution.  Petitioner challenges his

7    conviction in the Kern County Superior Court, which is located within the jurisdiction of this

8    Court.  28 U.S.C. § 2254(a); 2241(d).

9           On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

10   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

11   enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), cert. denied, 522 U.S.

12   1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting

13   Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

14   1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

15   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

16   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

17   B.    Standard of Review

18   _____This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

19   custody pursuant to the judgment of a State court only on the ground that he is in custody in

20   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

21          The AEDPA altered the standard of review that a federal habeas court must apply with

22   respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

23   Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

24   will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

25   to, or involved an unreasonable application of, clearly established Federal law, as determined by

26   the Supreme Court of the United States;" or "resulted in a decision that was based on an

27   unreasonable determination of the facts in light of the evidence presented in the State Court

28   proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

7

1  the Ninth Circuit's approach in <u>Van Tran v. Lindsey</u>, 212 F.3d 1143 (9th Cir. 2000)); <u>Williams v.</u>

2  <u>Taylor</u>, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

3  because that court concludes in its independent judgment that the relevant state-court decision

4  applied clearly established federal law erroneously or incorrectly."  <u>Lockyer</u>, at 1175 (citations

5  omitted).  "Rather, that application must be objectively unreasonable."  <u>Id.</u> (citations omitted).

6      While habeas corpus relief is an important instrument to assure that individuals are

7  constitutionally protected, <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

8  (1983); <u>Harris v. Nelson</u>, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

9  criminal conviction is the primary method for a petitioner to challenge that conviction.  <u>Brecht v.</u>

10  <u>Abrahamson</u>, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

11  factual determinations must be presumed correct, and the federal court must accept all factual

12  findings made by the state court unless the petitioner can rebut "the presumption of correctness

13  by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>Purkett v. Elem</u>, 514 U.S. 765, 115

14  S.Ct. 1769 (1995); <u>Thompson v. Keohane</u>, 516 U.S. 99, 116 S.Ct. 457 (1995); <u>Langford v. Day</u>,

15  110 F.3d 1380, 1388 (9th Cir. 1997).

16                                      **DISCUSSION**

17  A.     <u>Evidence of Blood Alcohol Test</u>

18      Petitioner argues that the blood alcohol test results used against him were invalid and

19  unreliable and that their introduction therefore violated his due process and equal protection

20  rights, as well as his right to a fair trial.  Petitioner contends that without this evidence, he would

21  not have been convicted of second degree murder.

22         1.     *Procedural Default*

23      Prior to reviewing Petitioner's claim on the merits, the Court must determine whether the

24  issue is procedurally defaulted, as Respondent suggests.  A federal court will not review claims

25  in a petition for writ of habeas corpus if the state court has denied relief on those claims by a

26  state law that is independent of federal law and adequate to support the judgment.  <u>Ylst v.</u>

27  <u>Nunnemaker</u>, 501 U.S. 797, 801, 111 S.Ct. 2590, 2592 (1991); <u>Coleman v. Thompson</u>, 501 U.S.

28  722, 729-30, 111 S.Ct. 2546, 2553-54 (1989); <u>see also</u> <u>Fox Film Corp. v. Muller</u>, 296 U.S. 207,

210, 56 S.Ct. 183, 184 (1935).  A state court's refusal to hear the merits of a claim because of

petitioner's failure to follow a state procedural rule is considered a denial of relief on

independent and adequate state grounds.  Harris v. Reed, 489 U.S. 255, 260-61, 109 S.Ct. 1038,

1042 (1989).  This doctrine of procedural default is based on the concerns of comity and

federalism. Coleman, 501 U.S. at 730-32, 111 S.Ct. at 2554-55.

In denying his petition for writ of habeas corpus, the Kern County Superior Court cited

Ex parte Lindley, 29 Cal.2d 709, 723 (1947) for the proposition that "[h]abeas relief is not

available to review the ruling of the trial court with respect to the admission or exclusion of

evidence."  A citation to Lindley stands for the proposition that insufficiency of the evidence

claims will not reviewed in a state habeas corpus petition.  In Carter v. Giurbino, 385 F.3d 1194

(9th Cir. 2005), the Ninth Circuit concluded that the Lindley rule, "is not intertwined with federal

substantive or procedural law." Id. at 1197.  When applying the Lindley rule, the state courts do

not apply federal law, therefore, it is an independent state ground. Id. at 1197-1198.  In Carter,

the Ninth Circuit determined that "the California courts have consistently applied Lindley since

1947." Id. at 1198 (citing In re Adams, 14 Cal.3d 629, 636 (1975); People v. Beghtel, 164

Cal.App.2d 294 (1958); In re Ring, 64 Cal.2d 450, 452 (1966)).

The Court therefore agrees with Respondent that Petitioner's claims were defaulted in

state court on an adequate and independent state ground.  If a petitioner has procedurally

defaulted a claim in state court, a federal court will not review the claim unless the

petitioner shows "cause and prejudice" for the failure to present the constitutional issue to the

state court, or makes a colorable showing of actual innocence.  Gray v. Netherland, 518 U.S. 152,

162 (1996).

Petitioner has made no such showing in the petition before this Court.  In his traverse, he

argues that he can establish cause and prejudice because of the "highly prejudicial weight that

evidence such as blood-alcohol results" have in juries' considerations, and the fact that this

evidence should never have been admitted.  To demonstrate cause, however, a petitioner must

show the existence of some external factor which impeded his efforts to comply with the state's

procedural rules.  See Martinez-Villareal v. Lewis, 80 F.3d 1301, 1305 (9th Cir.1996).  Although

9

1   he argues the merits of his claim, Petitioner offers no explanation as to why he failed to challenge

2   the evidence on direct appeal. Although both cause and prejudice must be shown to excuse a

3   procedural default, the Court need not examine the existence of prejudice if the petitioner fails to

4   establish cause. See Engle v. Isaac, 456 U.S. 107, 134 n. 43 (1982).

5        Petitioner also contends that he is actually innocent of the crimes of which he was

6   convicted in an attempt to avoid procedural default. To satisfy the "fundamental miscarriage of

7   justice" standard, Petitioner must establish by clear and convincing evidence that no reasonable

8   juror could have found him guilty of the offenses charged. See Dretke v. Haley, 541 U.S. 386

9   (2004); Majoy v. Roe, 296 F.3d 770, 776 (9th Cir.2002). The claim must be supported "with

10   new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness

11   accounts, or critical physical evidence-that was not presented at trial." Schlup v. Delo, 513 U.S.

12   298, 324 (1995); see also Sistrunk v. Armenakis, 292 F.3d 669, 672-73 (9th Cir.2002) (en banc)

13   (concluding that petitioner's claim of actual innocence seeking to discredit a prosecution's

14   witness, rather than affirmatively presenting new exculpatory evidence, did not fundamentally

15   call into question the reliability of petitioner's conviction); Gandarela v. Johnson, 286 F.3d 1080,

16   1086 (9th Cir.2002) (concluding that new evidence raising questions about the victim's motive to

17   lie but not providing evidence regarding the commission of the crime, does not present a

18   colorable claim of actual innocence).

19        Here, Petitioner makes only a conclusory statement that he is actually innocent and makes

20   no showing that no reasonable juror could have found him guilty. He has not presented any new

21   evidence, but has instead questioned the evidence presented at his trial. This is not sufficient to

22   demonstrate a fundamental miscarriage of justice.

23        2.   *Merits of Petitioner's Claim*

24        Even if this Court could review the merits of Petitioner's evidentiary claim, his claim

25   would fail. Petitioner argues that the evidence of his blood-alcohol level was tainted and

26   unreliable, in violation of his due process and equal protection rights. In support of his argument,

27   he contends that the test results were invalid because proper procedure was not followed, i.e.,

28   laboratory protocol was not followed, a chain of custody was not established until nine days after

the sample was taken, the sample was taken for medical testing, and it was not housed in a secure

location.  He also cites to the testimony of Dan DeFraga, Kern County Regional Crime

Laboratory supervising criminalist, in support of his argument.

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a

federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083,

1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for

the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a

denial of due process. Estelle v. McGuire, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41,

104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v.

Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294 (1994);

Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state

rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas

relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).

Only if there are no permissible inferences that the jury may draw from the evidence can its

admission rise to the level of a due process violation.  Id. at 920.

Here, Petitioner argues that the evidence of his blood-alcohol level was "tainted" and

"invalid" for several reasons.  As a result, he argues that there was no credible evidence to

support "that any crime took place, nor to indicate that Adam Pierce's untimely death was

anything more than the tragic result of a terrible vehicle accident."  Petition, at 5(b).

To the extent Petitioner argues that the results were invalid because the protocols of the

Kern County Regional Crime Laboratory were not followed, his argument fails.  Under

California law, the failure to follow state regulations does not result in a per se rule of exclusion.

People v. Williams, 28 Cal.4th 408 (2002).  Instead, noncompliance goes "only to the weight of

the evidence, not its admissibility."  Id. at 414.  Evidence, such as the blood-alcohol test results at

issue here, is admissible upon a showing that: (1) the instrument testing the sample was reliable;

(2) the test was properly administered; and (3) the operator was competent.  Id.

Petitioner relies mainly on the preliminary hearing testimony of Dan DeFraga, who

testified that the crime lab received a blood sample relating to Petitioner from Mercy Hospital.

CT 54.  Testing revealed a blood-alcohol content of .12 percent.  CT 52.  On cross-examination, Mr. DeFraga was asked why the word "invalid" appeared on the final case report.  He explained that in order to report an "actual result" and comply with the Department of Health and Safety regulations, the sample must be submitted according to "our protocol, which it wasn't; therefore, it has to be reported as such even though we did an analysis on it."  CT 57.  He explained that the protocol included using a kit supplied by the laboratory, and that if the protocol is not followed, "we can't officially report it out as a valid blood alcohol result."  CT 57.  The testimony continued:

| | |
|---|---|
| Petitioner's attorney: | So you will test what you get, but you are not willing to stand by it, you stamp invalid right on top of it? |
| Mr. DeFraga: | That's incorrect.  According to regulations, that is how we have to report it out. |
| Petitioner's attorney: | What regulations are you referring to? |
| Mr. DeFraga: | Title 17 and all of the procedures and protocols that go along with that. |
| Petitioner's attorney: | Okay.  So whenever you have a sample that doesn't comply with the protocols that you believe you are supposed to follow, that is, in matter of collection or matter of storage or whatever, they you report it out as you did with these samples as an invalid result for those regulatory purposes.  Is that right? |
| Mr. DeFraga: | Yes.  Correct. . . . |
| Petitioner's attorney: | And so when you see invalid right there, what it means is that, as you say, you can't say anything about how this sample was collected -- or your lab can't say anything about how it was collected, how it was transported, how it was stored, all you can say is that you got a sample from somewhere, you tested it, and you came up with some sort of result.  Is that right? |
| Mr. DeFraga: | Correct. |

CT 57-58.

Petitioner uses this testimony to argue that the test results should not have been admitted.  However, pursuant to Williams, the failure to follow certain protocols only goes to the weight of the evidence, rather than admissibility.  Mr. DeFraga's prior testimony demonstrated that the instrument testing the sample was reliable, the test was properly administered, and the operator was competent.  CT 49-53.  This showing was sufficient to admit the results into evidence.

1    While Petitioner was entitled to challenge the evidence at trial, he did not do so.  His arguments

2    before this Court, not surprisingly, are based solely on speculation.

3         Moreover, Petitioner suggests that there was no evidence that he was intoxicated, making

4    the alleged admission of the "tainted" evidence even more egregious.  However, numerous

5    witnesses who were with Petitioner on the night of the incident testified that they had been at a

6    club drinking prior to the accident and went to an area outside of town called the "Bone Yard" to

7    "party."  RT 124-128, 161-165, 196.  For example, one individual saw Petitioner pour a "pretty

8    big cup" of whisky, with some ice and soda, and heard him say that it would "top him off for the

9    night."  RT 164.  Right before the accident, Petitioner was told to slow down.  RT 178, 200.  A

10   firefighter who had been friends with Petitioner for five years arrived on the scene and testified

11   that he smelled alcohol on Petitioner.  RT 248.  Another firefighter who treated Petitioner

12   smelled alcohol on his breath.  RT 270-271.  Petitioner also told this friend, months after the

13   accident, that the results of blood testing might not help his case because of the condition he was

14   in.  RT 256.

15        Petitioner also points to the results from the Preliminary Alcohol Screen ("PAS") device,

16   which showed a reading of .000.  RT 77.  Officer Walker, who administered the test, testified

17   that it was possible that he could have made a mistake in taking the reading.  RT 78.  The jury

18   was entitled to weigh the totality of the evidence, including the results of the PAS.

19        Petitioner has failed to show that the admission of the blood-alcohol test results was

20   contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

21   Given the evidence before the jury, there were numerous reasonable inferences that the jury

22   could draw from the results.  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

23   B.   Ineffective Assistance of Counsel

24        Petitioner next contends that his counsel was ineffective for failing to (1) effectively

25   cross-examine Mr. DeFraga; (2) conduct adequate discovery and prepare for trial; (3) retain an

26   expert witness; and (4) adequately consult with Petitioner.

27        The law governing ineffective assistance of counsel claims is clearly established for the

28   purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

13

151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

the petitioner must show that counsel's performance was deficient, requiring a showing that

counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

representation fell below an objective standard of reasonableness, and must identify counsel's

alleged acts or omissions that were not the result of reasonable professional judgment

considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

(9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court

indulges a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694.

Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair

trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must evaluate whether

the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.;

Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir.

1994).

A court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since the defendant must

affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily

fail. However, there are certain instances which are legally presumed to result in prejudice, e.g.,

where there has been an actual or constructive denial of the assistance of counsel or where the

State has interfered with counsel's assistance.  See Strickland, 466 U.S. at 692; United States v.

Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at 2046-2047, and n. 25 (1984).

1   Ineffective assistance of counsel claims are analyzed under the "unreasonable

2   application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

3   1058, 1062 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may

4   grant the writ if the state court identifies the correct governing legal principle from [United States

5   Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's

6   case."  Williams, 529 U.S. at 413.  The habeas corpus applicant bears the burden to show that

7   the state court applied United States Supreme Court precedent in an objectively unreasonable

8   manner.  Price v. Vincent, 538 U.S. 634, 640 (2003).  With this standard in mind, the Court now

9   turns to each of Petitioner's claims of ineffective assistance of counsel.

10         1.   *Cross-Examination of Mr. DeFraga*

11   Based on his first argument that Mr. DeFraga's testimony established that the blood-

12   alcohol test results were invalid and unreliable, Petitioner contends that his attorney failed to

13   bring this up during cross-examination.  He suggests that had the testimony been subject to

14   "competent challenge" by his counsel, it never would have been admitted into evidence.  Both

15   the Fifth District Court of Appeal and the California Supreme Court denied this claim without

16   comment.

17   As the Court explained above, the blood-alcohol test results were not per se inadmissible,

18   as Petitioner suggests.  Instead, the failure to follow certain protocols, such as the protocols set

19   out by the Kern County Regional Crime Laboratory, goes to the *weight* of the evidence rather

20   than its admissibility.  To this end, Petitioner's counsel questioned Mr. DeFraga at length about

21   the meaning of the term "invalid" at the preliminary hearing.

22   Petitioner suggests that had the jury been aware "of this and other relevant facts which an

23   effective cross-examination would have revealed," it could have provided a reasonable person

24   with reasonable doubt.  Petition, at 5(f).  However, Petitioner is incorrect in arguing that an

25   "effective" cross-examination would have rendered the evidence inadmissible.  The testimony at

26   both the preliminary hearing and trial established the admissibility of the blood test results, and it

27   is unlikely that any further cross-examination could have produced a different result.  Indeed,

28   numerous health care professional involved in Petitioner's care on the night in question testified

15

to the manner in which Petitioner's blood was drawn and tested, a manner which complied with hospital procedure.  CT 31-35, 38-46, 50-63, 69-73; RT 275-279, 281-283, 286-288, 291, 296-299.

Petitioner has failed to demonstrate that counsel's alleged omissions fell below an objective standard of reasonableness, especially given the proper admission of the evidence in question.  Failure to make meritless objections does not constitute ineffective assistance of counsel.  See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994) (holding that an attorney's failure to make a futile motion is not ineffective assistance of counsel); Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989) (Counsel's failure to raise meritless legal argument does not constitute ineffective assistance of counsel).

      2.    *Conducting Discovery and Preparing for Trial*

Next, Petitioner argues that counsel failed to investigate any of the prosecution's witnesses, specifically Alejandro Lopez, and failed to investigate why Petitioner was not arrested until four months after the incident.

Generally, trial counsel has the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland v. Washington, 466 U.S. 668, 688 (1984).  Of course, the Sixth Amendment does not require counsel to interview every possible witness.  See LaGrand v. Stewart, 133 F.3d 1253, 1274 (9th Cir.1998) (holding performance not ineffective where trial counsel reviewed transcripts of interviews conducted by others).  Judicial scrutiny "must be highly deferential," and a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  "A claim of failure to interview a witness ... cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel."  Eggleston v. United States, 798 F.2d 374, 376 (9th Cir.1986) (citations and quotations omitted).  When the record clearly shows that the lawyer was well-informed, and the defendant fails to state what additional information would be gained by the discovery she or he now claims was necessary, an ineffective assistance claim fails.  Id.

1    Here, with the exception of Alejandro Lopez, Petitioner does not identify any information

2  that his counsel would have gained, nor does he specify which witnesses were not interviewed.

3    As to Mr. Lopez, Petitioner contends that counsel failed to investigate him for being an

4  accomplice to the crime.  Had counsel investigated, he could have examined him about

5  statements Mr. Lopez allegedly made relating to Petitioner's driving.  For example, Mr. Lopez

6  reportedly encouraged Petitioner to make the pass that resulted in the crash.  Petitioner also

7  points to the fact that Mr. Lopez left the scene of the accident, and that witnesses Petitioner

8  supplied knew that he did so out of fear and guilt.

9    The Kern County Superior Court denied this claim on habeas review, explaining that

10  Petitioner had not carried his burden of demonstrating prejudice and failed to suggest what

11  information counsel would have gained assuming he failed to interview Mr. Lopez.  The court

12  continued,

13        Lopez testified during trial in a manner inconsistent with his prior statements to the police
          and to other witnesses.  Lopez stated that he did not want to testify in the case.  At the
14        time of trial, Lopez was in custody for driving with a suspended license.  During his
          testimony, Lopez admitted leaving the scene of the accident before police arrived, and
15        further admitted to lying to the police regarding his presence at the accident.  These facts
          would cause the jury to distrust Lopez's testimony.  In addition, Lopez's testimony was
16        inconsistent.  California Highway Patrol Officer Connie Sellers testified that Lopez told
          her Petitioner was "driving like an idiot" on the night in question and was going too fast
17        to make the turn.  Wayne Yoakum and Kasey Mitchell testified that Lopez told them he
          had told Petitioner to slow down before the accident, which was inconsistent with
18        Lopez's trial testimony; thus, the jury must have viewed all of Lopez's statements with
          suspicion.  Furthermore, defense counsel argued that none of the parties involved in this
19        case were innocent bystanders.  He argued Lopez was "drunk as a skunk" on the night in
          question, thus calling into question anything he may have said that night.  He noted that
20        the witnesses' statements were aimed at keeping themselves out of trouble.  The
          prosecutor pointed out to the jury that it had to decide who in this case was telling the
21        truth.  Moreover, the jury was thoroughly instructed regarding how to evaluate a witness'
          credibility, particularly where the witness had criminal convictions, or had made
22        inconsistent or willfully false statements.  Thus, the jury was well equipped to assess the
          veracity of the witnesses' testimony.  Moreover, Lopez's testimony was more than
23        adequately corroborated.  Finally, sufficient evidence supports Petitioner's convictions.
          Thus, Petitioner has not shown that it is reasonably probable that the jury would have
24        provided Petitioner with a more favorable verdict had his counsel investigated and
          interviewed Lopez.

25  Lodged Document H, Exhibit B.

26    The state courts' determination of this issue was not contrary to, or an unreasonable

27  application of, clearly established Supreme Court precedent.  As the superior court thoroughly

28

17

explained, Mr. Lopez's testimony was sufficiently inconsistent and questionable so as to alert the jurors as to its truthfulness.  He responded to numerous questions with, "I don't remember," and he denied many prior statements to other witnesses.  He also admitted that he was drunk that night.  RT 125-135.

Petitioner's counsel also raised many of the issues that Petitioner now contends he omitted on cross-examination.  For example, he asked Mr. Lopez if he left the scene because he was scared of what might happen, to which Mr. Lopez replied, "I don't know if that was it.  I think I was just drunk."  RT 138.  Counsel brought up the fact that Mr. Lopez was scheduled to report to jail on the following Monday and suggested that he might have been thinking of the consequences.  He responded, "I don't know."  RT 139.  Counsel also elicited testimony about the inconsistent statements Mr. Lopez gave to law enforcement officials.  RT 141.  Petitioner has simply failed to show how he could have been prejudiced by counsel's alleged omissions given counsel's cross-examination, which certainly cast doubt on Mr. Lopez's testimony and raised many of the issues identified by Petitioner.

Insofar as Petitioner suggests that counsel should have investigated why he was arrested four months after the accident, he does not provide any insight into what injustices would have been revealed.  In his traverse, he suggests that the four month delay was "a matter of malicious prosecution because of who the deceased's family is," but this is nothing but speculation.

3.      *Expert Witness*

Petitioner further argues that counsel was ineffective for failing to retain an expert witness to discuss the effect oxygen would have on the breathalyzer test, which showed a result of .000.  Petitioner contends that since he was on oxygen just prior to the test and the result "differs so vastly from the Blood-alcohol test allegedly performed hours later, counsel had both a duty and an obligation to have investigated this matter."  Petition, at 5(h).  Petitioner believes that the jury should have had the benefit of expert testimony to support the validity of the .000 reading, i.e., that oxygen would not have affected the reading.

After the preliminary hearing, the prosecutor sought to admit evidence of a prior driving under the influence incident where Petitioner did not give an in-field alcohol breath test to

18

explain why the officer was unable to obtain an alcohol reading.  In objecting to the admission of

the evidence, defense counsel stated that the test result in the current action was relevant.  He

further explained:

> I was going to make nothing of the reading, partially strategically.  I know that the officer's testified he might have just misused the test and I also was aware of the thing the Court brought up, I don't know, I don't know of anybody who knows what affect the oxygenation had or what was going on there.
>
> If counsel, just to turn it around, if counsel wanted to use it to show the presence of alcohol, I would probably have objected for those same reasons.  But I had no intention of particularly making any point whatsoever of the fact that it was a triple zero that we got on that, other than the fact it was given and the circumstances under which that occurred.
>
> So that's basically my position, it's relevant, it goes to the investigation, what's relevant, and what was happening at the scene.  I don't think the PAS test has any -- I don't think I can lay a foundation, nor do I think counsel can lay a foundation that it has any validity one way or the another or any relevance to the actual level of intoxication in this case.  I wasn't going to use it to challenge that.  So maybe that delineates the issues a little closer.

RT 95.

Respondent argues, and this Court agrees, that counsel's tactical decision was objectively

reasonable.  The results of the PAS were not conclusive as to Petitioner's actual blood-alcohol

level, making the effect of oxygen on the result irrelevant.  Moreover, speculation about what an

expert could have said is not enough to establish prejudice.  Grisby v. Blodgett, 130 F.3d 365,

373 (9th Cir. 1997).

4.   *Consulting with Petitioner*

Petitioner's final allegation of ineffective assistance of counsel stems from his belief that

his attorney did not adequately consult with him and failed to follow up on information that he

gave him.  Petitioner contends that counsel could have established that he was "not inebriated at

the time of the vehicle accident," and that such evidence would have resulted in a different

verdict.

Again, Petitioner fails to indicate what further consultation and/or investigation would

have revealed and is therefore unable to demonstrate prejudice.  Although he states that he

provided counsel with the names of witnesses who "could have testified to his being sober at the

time of the accident," his claim is vague and speculative.  The state courts' determination of this

1    issue was not contrary to, or an unreasonable application of, clearly established Supreme Court

2    precedent.

3    C.    Illegal Search and Seizure

4    _____In an argument related to his first claim, Petitioner contends that he was denied due

5    process, equal protection and a fair trial by the use of evidence obtained as the result of an illegal

6    search and seizure.  Essentially, he argues that the blood which was eventually tested for alcohol

7    content was originally drawn for the sole purpose of medical testing.

8           This Court has only limited ability to grant relief on Fourth Amendment claims.  A

9    federal court cannot grant habeas corpus relief on the ground that evidence was obtained by an

10   unconstitutional search and seizure if the state court has provided the petitioner with a "full and

11   fair opportunity to litigate" the Fourth Amendment issue.  Stone v. Powell, 428 U.S. 465, 494, 96

12   S.Ct. 3037, 3052 (1976); Woolery v. Arvan, 8 F.3d 1325, 1326 (9th Cir. 1993).  The only inquiry

13   this Court can make is whether petitioner had a fair opportunity to litigate his claim, not whether

14   the state court correctly decided the claim.  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir.

15   1996).

16          Under California law, a defendant can move to suppress evidence on the basis that it was

17   obtained in violation of the Fourth Amendment.  See Cal.Penal Code § 1538.5.  There is no

18   indication that Petitioner was denied an opportunity to contest the evidence at trial.  Moreover,

19   Petitioner litigated his Fourth Amendment claim in his state habeas petitions to the Fifth District

20   Court of Appeal and the California Supreme Court.  Accordingly, Petitioner is not entitled to

21   habeas relief on this issue.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**<u>ORDER</u>**

Accordingly, IT IS HEREBY ORDERED that:

1.      The petition for writ of habeas corpus is DENIED; and

2.      The Clerk of the Court is DIRECTED to enter judgment in favor of Respondent.

        This terminates this action in its entirety.

IT IS SO ORDERED.

**Dated:    January 16, 2008**                          _____/s/ **Dennis L. Beck**_____
                                                        UNITED STATES MAGISTRATE JUDGE